## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:10-cv-268-RJC-DSC

| | |
|---|---|
| JOHN STRICKLAND, )<br><br>Plaintiff, )<br><br>v. )<br><br>AT&T UMBRELLA BENEFIT PLAN )<br>NO. 1, )<br><br>Defendant. ) | **ORDER** |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary

Judgment, (Doc. No. 18), Plaintiff's Motion for Summary Judgment, (Doc. No. 20), and the

related briefs and filings.

## I.    BACKGROUND

Plaintiff John Strickland ("Strickland" or "Plaintiff") is a former employee of BellSouth

Telecommunications, Inc. ("BellSouth") who has been insured under the AT&T Umbrella

Benefit Plan No. 1 (the "Plan" or "Defendant"), or its predecessor, the BellSouth Medical

Assistance Plan, since his retirement in 1998. (Doc. No. 16-4: 11/28/08 Administrative Denial

Letter at 1).  Blue Cross Blue Shield of Alabama ("BCBS") is the third-party administrator for

the Plan and is a claims fiduciary.  (Doc. No. 17-6 at 42: Administrative Record ("AR") 528).

Plaintiff became disabled in 1998, but remained eligible for group health benefits under

the Plan.  (Doc. No. 21 at 2).  Because of his disability, Plaintiff applied for and received Social

Security Disability Insurance ("SSDI") benefits.  (Id.).  After Plaintiff became eligible for SSDI

benefits, he became eligible for Medicare health benefit coverage.  (Id.).  He was given the

option of purchasing both Medicare "Part A" and "Part B" coverage.  (Doc. No. 20-2:

Declaration of John Strickland ("Strickland Decl.") at ¶¶ 3-5).

Plaintiff states that when he was notified of his eligibility for Medicare coverage, he contacted the Social Security Administration ("SSA") to determine whether he needed to purchase Medicare Part B coverage. (Doc. No. 21 at 2). According to Plaintiff, he was informed by the SSA that his Medicare coverage would be the "secondary payor," and that the Plan would remain as his primary payor until he reached the age of 62, so that there was no need for him to obtain Part B coverage until then. (Id. at 2-3). He therefore elected to purchase only Medicare Part A coverage.[1] (Id. at 3; Doc. No. 20-2: Strickland Decl. at ¶ 5).

After Plaintiff was notified by the SSA of his eligibility for Medicare coverage, and before he obtained the medical treatment at issue in this action, Plaintiff states that he also contacted BCBS, as the Plan's claims fiduciary and third-party administrator, to confirm that he did not need Medicare Part B coverage. (Doc. No. 21 at 3). Plaintiff contends that the BCBS claims representative informed him that his medical treatment would be covered by the Plan as the primary payor, and that he did not need to purchase Medicare Part B coverage until the age of 62. (Id.; Doc. No. 20-2: Strickland Decl. at ¶ 6). Plaintiff states that although the SSA and BCBS told him that he did not need to obtain Medicare Part B coverage until the age of 62, he later discovered that the written terms of the Plan required him to enroll in Medicare Part B as soon as he became eligible for it. (Doc. No. 21 at 3).

In January 2006, Plaintiff was aware that he required knee and shoulder surgery so, prior to receiving such treatment, his wife called BCBS to confirm that he had coverage. (Id.; Doc.

_____

[1] It is unclear from the materials of record exactly when this occurred. Based on the Court's calculations, it appears that it was in 2000 or 2001, when Plaintiff was approximately 53 or 54 years of age.

No. 20-2: Strickland Decl. at ¶ 7). BCBS confirmed the availability of coverage. (Id.; Doc. No. 17-7 at 8-9: BCBS 550-51). On that basis, he moved forward with knee and shoulder surgery and related physical therapy. (Doc. Nos. 21 at 3; 20-2: Strickland Decl. at ¶ 7).

Plaintiff's medical treatment in 2006 and early 2007 cost approximately $82,407.86. (Doc. No. 20-2: Strickland Decl. at ¶ 9). During this time period, BCBS continued to process and pay Plaintiff's medical claims as the primary payor.[2] (Doc. Nos. 21 at 4; 7: Def. Answer at ¶13). Between January 2006 and February 2007, BCBS records show approximately twenty-three calls from medical providers who were calling to confirm coverage. (Doc. Nos. 17-7 at 4-60: BCBS 546-602; 17-8 at 1-57: BCBS 603-659; 20-5: Summary of calls to BCBS by Medical Providers). They were consistently told that BCBS was the primary Plan. (Id.). Plaintiff argues that although he needed the treatment and surgery, it was not performed on an emergency basis and he could have applied for Medicare Part B before having the treatment if he had been given accurate information by BCBS. (Doc. No. 20-2: Strickland Decl. at ¶ 8).

On February 18, 2007, BCBS sent a form to Plaintiff, requesting information regarding other coverage. (Id. at ¶ 12; Doc. 17-1 at 1: AR 001). Plaintiff completed the form and returned it to BCBS, indicating that he had enrolled in Medicare Part A. (Id.). In May 2007, Plaintiff received a bill from a provider that had previously been paid by the Plan. (Id. at ¶ 14). Plaintiff called BCBS and learned that BCBS was recovering all of the Medicare Part B eligible charges that it had paid "in error." (Id.; Doc. Nos. 19 at 3; 20-3: Transcript of 5/7/07 telephone call).

---

[2] Also during this time period, BCBS initially denied several of Plaintiff's claims, assuming that his injuries were work-related and could therefore be covered by workers compensation. (Doc. No. 21 at 4). It took sixteen calls and a letter to BCBS to clear this up. (Doc. Nos. 17-1 at 8; 20-4 at 2-11). BCBS made no mention of Medicare Part B coverage during these calls. (Doc. No. 21 at 4).

BCBS never sent Plaintiff a claim denial letter or any advance notice of its intent to recover the payments. (Doc. No. 21 at 6).

On July 27, 2007, BCBS sent Plaintiff a letter informing him that the Plan requires his enrollment in both Medicare Part A and Medicare Part B. (Doc. No. 20-2: Strickland Decl. at ¶ 15). Aside from the summary plan description, this was the first written notice Plaintiff received that the Plan's coverage would be secondary, and that he needed to obtain Medicare Part B coverage. (Id.). Plaintiff promptly enrolled in Medicare Part B but because BCBS was making a retroactive determination that its coverage was secondary, Medicare Part B would not cover the previously incurred medical expenses. (Id. at ¶ 16). As a result, Plaintiff has unpaid medical bills amounting to approximately $82,407.86. (Id. at ¶ 17). Plaintiff states that "this action has destroyed his credit and subjected him to medical claims collection activity by the providers whose bills remain unpaid." (Doc. No. 21 at 7).

## II. DISCUSSION

Plaintiff seeks equitable relief under 29 U.S.C. § 1132(a)(3), claiming that he was misled by Defendant into believing that he did not need to enroll in Medicare Part B, and that he was not told otherwise until after significant medical expenses had been incurred. Section 1132(a)(3) states that a civil action may be brought under ERISA:

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

Defendant contends that Plaintiff may not proceed under § 1132(a)(3) because under the plain language of the Plan, Plaintiff was required to elect Medicare Part B. (Doc. Nos. 19 at 3; 16-4 at 1-2). His failure to do so caused the coverage under the Plan to become secondary and

4

also resulted in no coverage for charges that were eligible for Medicare Part B coverage.  (Id.).

The 2006 Summary Plan Description states:

> Once you or your dependents meet the eligibility requirements for Medicare, if you elect not to take Medicare Part B, there are no benefits available under the Plan. This includes services covered under either Medicare Part A or Medicare Part B.

(Doc. No. 16-4 at 1-2).  Plaintiff does not dispute the plain language of the Plan.  Instead, Plaintiff argues that he relied on BCBS's oral misrepresentations and misleading pattern of behavior.  Defendant responds that Plaintiff's argument pertaining to oral representations made by the claims administrator must fail because "oral promises are unenforceable under ERISA, and therefore cannot vary the terms of an ERISA plan."  (Doc. No. 25 at 4) (quoting Clark v. BASF Salaried Employees' Pension Plan, 329 F. Supp. 2d 694, 700 (W.D.N.C. 2004) (Thornburg, J.)).

Prior to May 16, 2011, Plaintiff's breach of fiduciary duty claim likely would not have survived.  However, on May 16, 2011, the Supreme Court decided CIGNA Corp. v. Amara, 131 S.Ct. 1866 (2011), which opened the door for the possibility of seeking equitable damages under the "other appropriate relief" provision of  the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3).  On the same day, without the benefit of Amara, the Fourth Circuit decided McCravy v. Metropolitan Life, 650 F.3d 414, 420 (4th Cir. 2011), with a potentially contrary holding.  In light of Amara, the Fourth Circuit has agreed to rehear McCravy.

In McCravy v. Metropolitan Life Ins. Co., 650 F.3d 414, the Fourth Circuit concluded that there was no equitable relief available under § 1132(a)(3) for a plan beneficiary who had been misled about coverage.  Plaintiff Debbie McCravy sued Defendant Metropolitan Life

Insurance Company ("MetLife"), alleging, among other things, breach of fiduciary duty, and

seeking damages under 29 U.S.C. § 1132(a)(3). McCravy alleged that the following facts

constituted a breach of fiduciary duty under ERISA:

- It was represented that McCravy's daughter, Leslie, had dependant life insurance coverage up to the time of her tragic death;

- Premiums were actually paid to and accepted by MetLife for Leslie up until her death;

- Unbeknownst to McCravy, Leslie was not eligible because Leslie was over the age of 19; and, consequently,

- Leslie did not purchase different life insurance or convert her coverage with MetLife.

The district court held that equitable relief was unavailable, stating "we are compelled to

limit any damages sought by Plaintiff in her § 1132(a)(3) claim to the premiums which were

withheld by Defendant for coverage which Plaintiff never actually had on the life of her

daughter." McCravy v. Metropolitan Life Ins. Co., 743 F. Supp. 2d 511, 524 (D.S.C. 2009). In

so deciding, the district court noted the inherent unfairness of its holding:

> However, while this Court is compelled to such a holding by the law of ERISA as interpreted by higher courts, it cannot ignore the dangerous practical implications of this application. The law in this area is now ripe for abuse by plan providers, which are almost uniformly more sophisticated than the people to whom they provide coverage. With their damages limited to a refund of wrongfully withheld premiums, there seems to be little, if any, legal disincentive for plan providers not to misrepresent the extent of plan coverage to employees or to wrongfully accept and retain premiums for coverage which is, in actuality, not available to the employee in question under the written terms of the plan.

> If the employee never discovers the discrepancy, the plan provider continues to receive windfall profits on the provision in question without bearing the financial risk of having to provide coverage. If the worst happens and the employee does file for the benefits for which he or she had been paying and seeks the coverage he or she believed was provided, the plan provider may then simply deny the employee's benefits claim, and have their legal liability limited to a refund of the premiums. The worst case scenario for fiduciary behavior which is either irresponsible or dishonest, then, in this context, is simply that the plan provider does not profit, but they would never be punished and would not be required to

6

> provide the coverage for which the employee was paying and for which, in cases like the present matter and <u>Amschwand v. Spherion Corp.</u>, 505 F.3d 342 (5th Cir. 2007), the employee asserts he or she was assured by the provider existed.
>
> Plaintiff's allegations in this case present a compelling case for the availability of some sort of remedy for the breach of fiduciary duty above and beyond the mere refund of wrongfully retained premiums. Plaintiff's assertion, based largely upon the Solicitor General's amicus curie brief to the Supreme Court recommending that certiorari be granted in <u>Amschwand</u>, that much of the caselaw in the area of available remedies for § 1132(a)(3) actions is based upon an erroneous understanding of the equitable remedies traditionally available under trust law is undeniably well-researched and compelling. This Court agrees wholeheartedly with Judge Benavides' very brief concurring opinion in <u>Amschwand</u>, which stated simply that "[t]he facts as detailed in Chief Judge Jones's opinion scream out for a remedy beyond the simple return of premiums. Regrettably, under existing law it is not available. I am constrained to join the court's opinion, which I find correctly applies controlling precedent." <u>Id.</u> at 348-49. This Court is aware of the irony of its using the word "equity" so often in an Order which sustains a legal application which can potentially be abused, but the law at present prohibits Plaintiff from seeking consequential damages in a § 1132(a)(3) claim, so Plaintiff's damages on this claim are limited to a refund of the withheld premiums.

<u>Id.</u> Both parties appealed the district court's decision and the Fourth Circuit affirmed the judgment on May 16, 2011.

Also on May 16, 2011, the Supreme Court held that § 1132(a)(3) could permit equitable relief in certain contexts. <u>See</u> <u>CIGNA Corp. v. Amara</u>, 131 S.Ct. 1866 (2011). In <u>Amara</u>, the district court found that CIGNA failed to properly notify its employees—and defined-benefit retirement plan beneficiaries—of changes to their benefits. <u>See id.</u> at 1872. For relief, the court reformed the new plan, providing benefits according to the terms of the old plan when it was favorable to the plaintiffs, and ordered CIGNA to pay benefits accordingly. <u>Id.</u> at 1871. The district court ruled that § 1132(a)(1)(B) provided authority to reform the plan and noted that Supreme Court precedent indicated that such relief would not be available under § 1132(a)(3). <u>Id.</u> at 1876. In a brief summary order, the Second Circuit affirmed "the judgment of the district court for substantially the reasons stated" in the District Court's "well-reasoned and scholarly

7

opinions." Id. (quoting Amara v. CIGNA Corp., 348 F. App'x 627 (2009)).  The Supreme Court

reversed, holding that § 1132(a)(1)(B) did not authorize the district court's reformation of

CIGNA's pension plan, but the Court then explained that § 1132(a)(3) could permit the district

court to fashion similar equitable relief.  Id. at 1878-80.

The Amara Court provided examples of "appropriate equitable relief" that a beneficiary

might obtain against a plan fiduciary under § 1132(a)(3), id. at 1878, and distinguished its prior

cases that interpreted "appropriate equitable relief" in a more narrow fashion, see, e.g., Sereboff

v. Mid Atlantic Med. Srvs., 547 U.S. 356 (2006); Great-West Life & Annuity Ins. Co. v.

Knudson, 534 U.S. 204 (2002).  In particular, the Court explained that simply because a plaintiff

is seeking monetary relief for a breach of fiduciary duty "does not remove it from the category of

traditionally equitable relief."  Id. at 1880.  Indeed, "[e]quity courts possessed the power to

provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach

of duty, or to prevent the trustee's unjust enrichment."  Id.  The Court noted that "[t]he surcharge

remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a

duty imposed upon that fiduciary."  Id.

Here, Plaintiff contends that Defendant misled him to believe that he did not need

Medicare Part B coverage.  Plaintiff alleges that the following facts, among others, constitute a

breach of fiduciary duty under ERISA:

- At some point before 2006, Plaintiff contacted BCBS to confirm that he did not need Medicare Part B coverage.  He was informed that he did not need to purchase Medicare Part B coverage until the age of 62.

- On January 9, 2006, prior to Plaintiff's knee and shoulder surgeries, Plaintiff's wife called BCBS to confirm her husband's coverage, and a BCBS customer service representative confirmed such coverage.

- From January 2006 through February 2007, BCBS continued to process and pay

8

Plaintiff's medical claims as the primary payor.

- Between January 2006 and February 2007, BCBS received approximately twenty-three calls from medical providers who were calling to confirm coverage, and BCBS confirmed such coverage.

- Plaintiff could have applied for Medicare Part B coverage before having surgery if he had been given accurate information by BCBS.

In light of the Supreme Court's ruling in <u>Amara</u>, the Fourth Circuit agreed to rehear the <u>McCravy</u> case. A panel rehearing is scheduled for May 15, 2012. Because of the factual and legal similarities between Plaintiff's case and the <u>McCravy</u> case, the Court will stay this case pending a decision by the Fourth Circuit after rehearing the <u>McCravy</u> case.

## III. CONCLUSION

**IT IS, THEREFORE, ORDERED** that this case is **STAYED** pending a decision by the Fourth Circuit after rehearing <u>McCravy v. Metropolitan Life</u>, 650 F.3d 414, 420 (4th Cir. 2011).

Signed: April 13, 2012

Robert J. Conrad, Jr.
Chief United States District Judge

9