UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10-cv-268-RJC-DSC

| JOHN STRICKLAND, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **ORDER** |
| AT&T UMBRELLA BENEFIT PLAN NO. 1, | ) | |
| Defendant. | ) | |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment, (Doc. No. 18), and Plaintiff's Motion for Summary Judgment, (Doc. No. 20), both of which, for the reasons set forth below, are **DENIED**.

I.  BACKGROUND

Plaintiff John Strickland ("Strickland" or "Plaintiff") is a former employee of BellSouth Telecommunications, Inc. ("BellSouth") who has been insured under the AT&T Umbrella Benefit Plan No. 1 (the "Plan" or "Defendant"), or its predecessor, the BellSouth Medical Assistance Plan, since his retirement in 1998. (Doc. No. 16-4: 11/28/08 Administrative Denial Letter at 1). Blue Cross Blue Shield of Alabama ("BCBS") is the third-party administrator for the Plan and is a claims fiduciary. (Doc. No. 17-6 at 42: Administrative Record ("AR") 528).

Plaintiff became disabled in 1998, but remained eligible for group health benefits under the Plan. (Doc. No. 21 at 2). Because of his disability, Plaintiff applied for and received Social Security Disability Insurance ("SSDI") benefits. (Id.). After Plaintiff became eligible for SSDI benefits, he became eligible for Medicare health benefit coverage. (Id.). He was given the option of purchasing Medicare "Part A" and "Part B" coverage. (Doc. No. 20-2: Declaration of

John Strickland ("Strickland Decl.") at ¶¶ 3-5).

Plaintiff states that when he was notified of his eligibility for Medicare coverage, he contacted the Social Security Administration ("SSA") to determine whether he needed to purchase Medicare Part B coverage. (Doc. No. 21 at 2). According to Plaintiff, he was informed by the SSA that his Medicare coverage would be the "secondary payor," and that the Plan would remain as his primary payor until he reached the age of 62, so that there was no need for him to obtain Part B coverage until then. (Id. at 2-3). He therefore elected to purchase only Medicare Part A coverage. (Id. at 3; Doc. No. 20-2: Strickland Decl. at ¶ 5).

In or around 2005, before Plaintiff obtained the medical treatment at issue in this action, Plaintiff states that he also contacted BCBS, the Plan's claims fiduciary and third-party administrator, to confirm that he did not need Medicare Part B coverage. (Doc. Nos. 17-9 at 1: BCBS 703; 21 at 3). Plaintiff contends that the BCBS claims representative informed him that his medical treatment would be covered by the Plan as the primary payor, and that he did not need to purchase Medicare Part B coverage until the age of 62.[1] (Id.; Doc. No. 20-2: Strickland Decl. at ¶ 6). Plaintiff states that although the SSA and BCBS told him that he did not need to obtain Medicare Part B coverage until the age of 62, he discovered in May 2007 that the written terms of the Plan required him to enroll in Medicare Part B as soon as he became eligible for it. (Doc. No. 21 at 3).

In January 2006, Plaintiff's wife called BCBS and received confirmation that Plaintiff had insurance coverage for an emergency hospitalization. See (Doc. No. 17-7 at 8-9: BCBS 550-51). Plaintiff states that he relied on this confirmation when he decided to move forward

---

[1] There is no transcript of this call in the record.

with costly knee and shoulder surgery. (Doc. Nos. 21 at 3; 20-2: Strickland Decl. at ¶ 7). Although Plaintiff needed the knee and shoulder surgery, it was not performed on an emergency basis. (Doc. No. 20-2: Strickland Decl. at ¶ 8). If Plaintiff had known he needed Medicare Part B, he claims he would have had time to apply for it prior to having surgery. (Id.).

In the Fall of 2006, BCBS initially denied Plaintiff's claims related to his knee and shoulder surgery, assuming that his injuries were work-related and could therefore be covered by workers compensation. (Doc. No. 21 at 4). It took sixteen phone calls between September 2006 and March 2007, and a letter to BCBS, to clear this up. (Doc. Nos. 17-1 at 5-8: AR 005-08; 17-7 at 50-60: AR 592-602; 17-8 at 1-80: AR 603-82; 20-4 at 2-11: Summary of Calls). BCBS made no mention of Medicare Part B coverage during these calls. (Doc. No. 21 at 4).

Plaintiff's medical treatment in 2006 and early 2007 cost approximately $82,407.86. (Doc. No. 20-2: Strickland Decl. at ¶ 9). During this time period, BCBS continued to process and pay Plaintiff's medical claims as the primary payor. (Doc. Nos. 21 at 4; 7: Answer at ¶13). Between January 2006 and February 2007, BCBS records show approximately twenty-three calls from medical providers to confirm coverage. (Doc. Nos. 17-7 at 4-60: BCBS 546-602; 17-8 at 1-57: BCBS 603-659; 20-5: Summary of calls to BCBS by Medical Providers). They were told that BCBS was the primary Plan. (Id.).

On February 18, 2007, BCBS sent a form to Plaintiff, requesting information regarding other coverage. (Doc. Nos. 17-1 at 1: AR 001; 20-2 at ¶ 12). Plaintiff completed the form and returned it to BCBS, indicating that he was enrolled in Medicare Part A. (Doc. No. 20-2 at ¶ 12). In May 2007, Plaintiff received a bill from a provider that had previously been paid by the Plan. (Id. at ¶ 14). Plaintiff called BCBS and learned that BCBS was recovering all of the Medicare

Part B eligible charges that it had paid "in error."[2] (Id.; Doc. Nos. 19 at 3; 20-3: Transcript of 5/7/07 telephone call). Plaintiff states that, without any advanced notice, "BCBS had contacted all of his medical providers and demanded recovery of the payments previously made to them by the Plan on Plaintiff's behalf. The providers dutifully reimbursed BCBS and then turned around and sent bills to Mr. Strickland for the full amount of their charges." (Doc. No. 21 at 6). After Plaintiff received a bill from a previously paid medical provider, he reviewed the 2007 Summary Plan Description ("SPD") that the Plan had provided to him. Although Plaintiff had not reviewed the applicable Medicare portion of the 2006 SPD, the 2005 and 2006 SPDs each contained provisions substantially similar to the following:

> Once you or your dependents meet the eligibility requirements for Medicare, if you elect not to take Medicare Part B, there are no benefits available under the Plan. This includes services covered under either Medicare Part A or Medicare Part B.

(Doc. Nos. 16-4 at 1-2; No. 17-8 at 94: BCBS 696). The 2007 SPD contained a slightly different provision, which provided that charges for Part A eligible services would be covered under the Plan secondary to Medicare, without regard to whether Plaintiff enrolled in Medicare Part B:

> Once you or your dependents meet the eligibility requirements for Medicare, if you enroll in Medicare Part A but fail to elect coverage for Medicare Part B, your Part A eligible charges will process secondary to Medicare and there will be no coverage under the Plan for Medicare Part B eligible charges. If you elect not to enroll in Medicare Part A and Medicare Part B, you have no benefits under the Plan for any Medicare eligible service.

(Doc. No. 16-4 at 2).

---

[2] At some point between February 18, 2007 and July 18, 2007, Plaintiff states that either BCBS or the Plan wrote to the Centers for Medicare and Medicaid Services ("CMS") seeking a determination that certain employees, including Plaintiff, be found eligible to have Medicare as their primary payor of health benefits, under Medicare Parts A and B, and that the Plan would be secondary. (Doc. No. 21 at 5). This inquiry is not part of the administrative record.

4

On July 27, 2007, BCBS sent Plaintiff a letter informing him that the Plan required his enrollment in both Medicare Part A and Medicare Part B. (Doc. Nos. 17-1 at 28: AR 028; 20-2: Strickland Decl. at ¶ 15). Aside from the SPD, this was the first written notice Plaintiff received that the Plan's coverage would be secondary, and that he needed to obtain Medicare Part B coverage. (Id.). Plaintiff promptly enrolled in Medicare Part B, but because BCBS was making a retroactive determination that its coverage was secondary, Medicare Part B would not cover the previously incurred medical expenses. (Doc. No. 20-2 at ¶ 16). As a result, Plaintiff has unpaid medical bills amounting to approximately $82,407.86. (Id. at ¶ 17). Plaintiff states that "this action has destroyed his credit and subjected him to medical claims collection activity by the providers whose bills remain unpaid." (Doc. No. 21 at 7).

After Plaintiff learned that his benefit claims were being denied, he retained an attorney in Greenville, South Carolina. His attorney wrote to BCBS on August 17, 2007 to determine whether the claims had been denied, and if so to request administrative review. (Doc. No. 17-1 at 12-16: AR 012-16). BCBS did not respond to that letter, so Plaintiff's attorney wrote to BCBS four more times on September 17, 2007, (Doc. No. 17-1 at AR 022), December 11, 2007, (Doc. No. 17-1 at AR 021), January 9, 2008, (Doc. No. 17-1 at AR 017), and January 14, 2008, (Doc. No. 17-1 at AR 020). Hearing no response from BCBS to these five letters, Plaintiff filed suit in the United States District Court for the District of South Carolina on January 26, 2008, seeking benefits under 29 U.S.C. § 1132 (a)(1)(B).[3] (Doc. No. 16-1: Complaint in D.S.C. 6:08-273-RBH). The Plan answered, raising failure to exhaust administrative remedies as its

---

[3] On January, 25, 2008, BCBS sent Plaintiff a letter informing him that in order for BCBS to respond directly to his attorney, Plaintiff would need to fill out an Authorization for Disclosure of Protected Health Information form. (Doc. No. 17-1 at 27: AR 027).

5

first defense. (Doc. No. 16-2). The civil action was subsequently stayed while Plaintiff pursued his administrative remedies with the Plan. (Doc. No. 16-3: Stay Order in D.S.C. 6:08-273-RBH).

Following administrative review of all claims denied between October 20, 2005 and September 25, 2007, BCBS upheld the denial of Plaintiff's benefit claims, concluding that Medicare Part B should have provided the primary coverage and finding that since Plaintiff was not enrolled in Part B, the Plan was not responsible for any of his medical bills during this time period. (Doc. Nos. 21 at 8; 16-4: 11/28/08 Administrative Denial Letter). Thereafter, the stay on the civil action was lifted. (Doc. No. 21 at 8). However, Defendant's attorney joined Plaintiff's counsel's law firm, causing a conflict of interest which resulted in the action being dismissed without prejudice pursuant to Rule 41 on April 30, 2009. (Id.). Plaintiff filed this action on June 18, 2010, (Doc. No. 1), and amended his Complaint on July 30, 2010, (Doc. No. 3).

The parties filed cross motions for summary judgment. See (Doc. Nos. 18; 20). Through their Motions and related briefing, the parties debate the meaning of the Supreme Court's opinion in CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2011), which was published on May 16, 2011. In Amara, employees filed a class action against an employer and pension plan, claiming that the employer's conversion of a traditional defined benefit plan to a cash balance retirement plan "provided them with less generous benefits." 131 S. Ct. at 1870. According to the plaintiffs, the employer's disclosures and notices regarding the change and the new plan were defective, harmful, and contrary to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Id. The Supreme Court addressed whether broad remedies were available under 29 U.S.C. § 1132(a)(3), with its "appropriate equitable relief" language. Id. at 1871.

Also on May 16, 2011, without the benefit of Amara, the Fourth Circuit decided McCravy v. Metropolitan Life, 650 F.3d 414 (4th Cir. 2011) ("McCravy I"). In McCravy, the plaintiff purchased life insurance for her daughter and paid yearly premiums for coverage. But when her daughter was murdered at the age of twenty-five, the plan administrator denied the plaintiff's claim on the basis that her daughter had been ineligible for coverage since her nineteenth birthday. However, as is alleged in the present case, the plaintiff alleged that she was told by agents of the defendant that her daughter was covered, and the defendant continued to accept premiums for the coverage. The plaintiff sought to bring a claim for equitable relief under 29 U.S.C. § 1132(a)(3). The district court held that equitable relief was unavailable, stating "we are compelled to limit any damages sought by Plaintiff in her § 1132(a)(3) claim to the premiums which were withheld by Defendant for coverage which Plaintiff never actually had on the life of her daughter." McCravy v. Metropolitan Life Ins. Co., 743 F. Supp. 2d 511, 524 (D.S.C. 2009). In so deciding, the district court noted the inherent unfairness of its holding, stating "that there seems to be little, if any, legal disincentive for plan providers not to misrepresent the extent of plan coverage to employees . . . ." Id. The district court continued:

> If the employee never discovers the discrepancy, the plan provider continues to receive windfall profits on the provision in question without bearing the financial risk of having to provide coverage. If the worst happens and the employee does file for the benefits for which he or she had been paying and seeks the coverage he or she believed was provided, the plan provider may then simply deny the employee's benefits claim, and have their legal liability limited to a refund of the premiums. The worst case scenario for fiduciary behavior which is either irresponsible or dishonest, then, in this context, is simply that the plan provider does not profit, but they would never be punished and would not be required to provide the coverage for which the employee was paying and for which, in cases like the present matter and Amschwand [v. Spherion Corp., 505 F.3d 342 (5th Cir. 2007)], the employee asserts he or she was assured by the provider existed.

Id. Both parties appealed the district court's decision and the Fourth Circuit affirmed the

7

judgment on May 16, 2011. McCravy I, 650 F.3d 414. However, in light of Amara, the Fourth Circuit agreed to rehear McCravy. Because of the factual and legal similarities between McCravy and the present case, on April 13, 2012, this Court stayed the present case pending a decision by the Fourth Circuit after rehearing McCravy. (Doc. No. 28).

After a panel rehearing on May 15, 2012, the Fourth Circuit analyzed Amara in McCravy v. Metropolitan Life Ins. Co., Nos. 10-1074, 10-1131, 2012 WL 2589226 (4th Cir. Jul. 5, 2012) ("McCravy II"). The Fourth Circuit explained that "[b]efore Amara, various lower courts, including this one, had (mis)construed Supreme Court precedent to limit severely the remedies available to plaintiffs suing fiduciaries under Section 1132(a)(3)." Id. at *3 (citation omitted). "But with Amara," the Fourth Circuit stated, "the Supreme Court 'expanded the relief and remedies available to plaintiffs asserting breach of fiduciary duty under [Section 1132(a)(3)] and therefore seeking make-whole relief such as equitable relief in the form of 'surcharge.'" Id. (citing Amara, 131 S. Ct. at 1870). The Fourth Circuit summarized: "In sum, the portion of Amara in which the Supreme Court addressed Section 1132(a)(3) stands for the proposition that remedies traditionally available in courts of equity, expressly including estoppel and surcharge, are indeed available to plaintiffs suing fiduciaries under Section 1132(a)(3)." Id. at *4.

With this new guidance in mind, the Court turns to the present case.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides

8

that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. See id. On cross-motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir.1985).

### III. ANALYSIS

    A. Defendant's Motion for Summary Judgment[4]

Plaintiff argues that, after Amara, he is entitled to equitable relief under 29 U.S.C. § 1132(a)(3)[5] to remedy the fiduciary breach that prevented him from obtaining coverage under

---

[4] The Court will construe this motion as inclusive of all arguments in Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment. See (Doc. No. 24).

[5] Despite pleading a claim for life insurance benefits under § 1132(a)(1)(B) in his Amended Complaint, see (Doc. No. 3 at 8), Plaintiff concedes in his Motion for Summary Judgment that he has no claim for benefits under that subsection. See (Doc. No. 21 at 14).

9

Medicare Part B before seeking medical treatment. (Doc. No. 21 at 13-14). Plaintiff claims that he was misled by Defendant's oral representations and misleading pattern of behavior. Section 1132(a)(3) states that a civil action may be brought under ERISA:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

Defendant asserts three responsive arguments in its Motion for Summary Judgment.[6] First, Defendant argues that ERISA does not provide a cause of action for breach of fiduciary duty under Section 1132(a)(3) where the plaintiff has a remedy under another provision of ERISA. (Doc. No. 19 at 16). In support of this argument, Defendant cites the 1996 Supreme Court case of Varity Court v. Howe, 516 U.S. 489 (1996). Plaintiff responds, and the Court agrees, that Defendant's reliance on pre-Amara cases is misplaced. In light of the Supreme Court's decision in Amara, 131 S. Ct. 1866, and the Fourth Circuit's interpretation of Amara in McCravy, 2012 WL 2589226, equitable relief is now available. See also Israel v. Prudential Ins. Co. of Am., No. 7:11-793-TMC, 2012 WL 3116544, at *5 (D.S.C. July 31, 2012) ("Now indisputably, the Supreme Court and the Fourth Circuit have held that equitable relief is

---

Instead, Plaintiff seeks relief under § 1132(a)(3), and attorneys' fees under § 1132(g). The Court will hold in abeyance the issue of attorneys' fees for determination at such time as the remainder of the case is resolved on the merits.

[6] The Court does not address the applicable standard of review for claim denials because Plaintiff concedes that he does not have a claim for benefits under the plain terms of the Plan documents. Instead, the remaining issues pertain only to whether Plaintiff has a claim for breach of fiduciary duty, notwithstanding the plain language of the Plan documents. See McCravy II, 2012 WL 2589226; Israel v. Prudential Ins. Co. of Am., No. 7:11-793-TMC, 2012 WL 3116544, at *5 (D.S.C. July 31, 2012).

available to a plaintiff pursuing a claim under § 1132(a)(3).").

Next, Defendant half-heartedly argues that Plaintiff should have raised his breach of fiduciary duty claim during the administrative proceedings. (Doc. No. 19 at 18). Defendant quickly concedes, however, that although ordinarily a claimant must exhaust his administrative remedies before pursuing litigation, "[t]hat does not appear to be the case for claims of breach of fiduciary duty." (Id.). Notwithstanding its concession, Defendant still complains that Plaintiff's seemingly late assertion of this claim "does give one cause for concern as to whether the claim is one of recent origin." (Id. at 19). As Plaintiff notes, there does not appear to be any requirement in the Fourth Circuit that Plaintiff raise all of his arguments at the administrative review level. While the Fourth Circuit has not directly addressed this issue in an ERISA case, the Third and Ninth Circuits have both hold that in an ERISA context, issue exhaustion is not required. See Wolf v. Nat'l Shopmen Pension Fund, 728 F.2d 182, 186 (3d Cir. 1984) ("Section 502(a) of ERISA does not require either issue or theory exhaustion; it requires only claim exhaustion."); Vaught v. Scottsdale Healthcare Corp. Health Plan, 546 F.3d 620, 631 (9th Cir. 2008) ("Sims [v. Apfel, 530 U.S. 103 (2000)] leads to the conclusion that issue exhaustion is not applicable in the ERISA context."). Defendant's second argument fails.

Defendant's third argument is also dead in the water after Amara. Defendant contends that Plaintiff's alleged reliance on BCBS's oral representations is irrelevant because (1) "oral promises are unenforceable under ERISA, and therefore cannot vary the terms of an ERISA plan;" and (2) Plaintiff cannot show his reliance was reasonable because "the representation upon which he contends he relied was contrary to the written terms of the Defendant plan." (Doc. No. 25 at 4, 5). In light of Amara, this argument fails. The McCravy II Court explained:

As the Supreme Court pronounced in Amara, "surcharge," i.e., "make-whole

11

relief," constitutes "appropriate equitable relief" under Section 1132(a)(3). 131 S. Ct. at 1880. Indeed, "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment . . . . [P]rior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a 'surcharge,' was 'exclusively equitable.'" Id. (citations omitted).

The Supreme Court has made quite clear that surcharge is available to plaintiffs suing fiduciaries under Section 1132(a)(3).

2012 WL 2589226, at *5. The Court finds that Plaintiff is not precluded from recovery, as a matter of law, based on the written terms of the plan. See id. Defendant's Motion for Summary Judgment, (Doc. No. 19), is **DENIED**.

B. Plaintiff's Motion for Summary Judgment

Plaintiff argues that Defendant breached its fiduciary duty to him through BCBS's oral misrepresentations and misleading pattern of behavior. Plaintiff alleges that this caused him to believe that he did not need to enroll in Medicare Part B, and that he was not told otherwise until significant medical expenses had been incurred. (Doc. No. 21 at 9). The Court will first consider Plaintiff's alleged reliance on BCBS's oral representations.

1. BCBS's Alleged Oral Misrepresentations

The Fourth Circuit explained in Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371 (4th Cir. 2001) that "Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts." Id. at 380 (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989)). "Under common law trust principles, a fiduciary has an unyielding duty of loyalty to the beneficiary." Id. (citation omitted). "Naturally," the Fourth Circuit emphasized, "such a duty of loyalty precludes a fiduciary from making material misrepresentations to the beneficiary." Id. (citations omitted). A fiduciary's responsibility is not limited to a mere duty to refrain from intentionally misleading a beneficiary. Id. Rather, "ERISA administrators have a

fiduciary obligation not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." Id. (quotation omitted).

Plaintiff contends that he relied primarily on two phone calls to BCBS which led him to erroneously believe he was covered by the Plan for Medicare Part B eligible expenses.

        a.        2005 Telephone Call with BCBS

First, Plaintiff states that after he became eligible for Medicare, he made the first of two significant phone calls:

> After plaintiff was notified by the Social Security Administration of his eligibility for Medicare coverage, and before he obtained the medical treatment at issue in this action, he contacted BCBS, as the Plan's claims fiduciary and third-party administrator, to confirm that he had insurance coverage for his needed treatment, and to confirm that he did not need Medicare "Part B" coverage. He was informed by BCBS that the Plan would remain as his primary payor until he reached the age of 62. Thus, the BCBS claims representative informed him, his anticipated medical treatment would be covered by the Plan as the primary payor, and he would not need to purchase Medicare Part B coverage. This information was entirely consistent with the information that Plaintiff previously had received from Medicare.

(Doc. No. 3 at ¶ 11); see also (Doc. No. 20-2: Strickland Decl. at ¶ 6) (stating same). There is no transcript of this telephone conversation in the administrative record.

To refute Plaintiff's allegation that this telephone call occurred, Defendant refers to transcripts of two telephone conversations between BCBS representatives and Plaintiff. First, on May 7, 2007, Plaintiff called BCBS after he received a bill from a medical service provider that was initially paid by Defendant. The BCBS representative asked Plaintiff whether there was any reason he did not have Medicare Part B, and Plaintiff responded: "Well, I'm . . . really not old enough to get that yet . . . . I got to be 65 before I can start using that. It has to come off according to them. This comes off of my insurance until I'm 65 and then that's when that is required is what they told me at Medicare." (Doc. No. 17-8 at 82: BCBS 684) (emphasis added).

13

Defendant argues that, "rather than complain that Blue Cross had told him something different previously, Mr. Strickland merely states 'I'm not on medicare yet. I'm not old enough for it' [and] . . . blames 'Medicare' rather than Blue Cross." (Doc. No. 19 at 19).

Defendant also points to the transcript of a June 12, 2007 call as evidence that Plaintiff did not rely on BCBS's representations, arguing that Plaintiff "again placed the blame for not having enrolled in Medicare Part B on the federal government, not Blue Cross." (Doc. No. 19 at 2). Plaintiff stated in the June 12, 2007 call: "It was 2005 [] whenever they had first asked me about it and I told them, well see, I had already called somebody from Medicare and I told them about that and they said, no, you don't need that until you are 65." (Doc. No. 17-9 at 1: BCBS 703).

There is a genuine issue of material fact regarding BCBS's alleged oral misrepresentation in 2005. In Israel v. Prudential Ins. Co. of Am., No. 7:11-793-TMC, 2012 WL 3116544, at *5 (D.S.C. July 31, 2012), the only case which has thus far applied McCravy II, the District of South Carolina had a similar set of facts before it. In Israel, the pertinent life insurance contract provided that coverage would cease when an individual stopped being a qualified dependent. Id. at *1. Under the terms of the policy, divorce was a disqualifying event. Id. The plaintiff alleged that he called someone in the benefits department in November 2009 and was informed that, notwithstanding the terms of the insurance contract, he could continue the life insurance coverage on his wife after their divorce. Id. When the plaintiff's ex-wife passed away, he made a claim for life insurance benefits, which was denied because his ex-wife was no longer an eligible dependent due to their divorce. Id. The district court noted that, after Amara and McCravy II, equitable relief was an available remedy for the plaintiff. However, the court denied both parties' motions for summary judgment on the issue of breach of fiduciary duty,

explaining that the plaintiff's "claims for equitable relief under § 1132(a)(3) require intensive factual determinations. In particular, a finder of fact must make determinations as to the factual issues surrounding the alleged November 2009 phone call and whether he was reliably informed that coverage would continue post-divorce." Id. at *6. The defendants alleged that the third-party benefits administrator had no record that any call took place. Id. While the Defendant in the present case has not alleged that BCBS searched for a record of the 2005 call, Defendant does raise enough of a genuine issue of material fact regarding whether the 2005 call occurred, and the contents of that conversation, to preclude summary judgment.

          b.        January 9, 2006 Telephone Call with BCBS

Plaintiff also alleges that BCBS misrepresented his coverage during a second telephone call on January 9, 2006. On that date, Plaintiff's wife, Pat Strickland, called BCBS to confirm coverage for Plaintiff's hospitalization:

| | |
|---|---|
| Pat: | I'm calling for my husband John Strickland. He was admitted to uh the Easley Baptist Hospital on Friday night . . . |
| | . . . |
| BCBS: | We're your primary? |
| Pat: | This is the primary uh huh |
| BCBS: | Ok. Ok, I am showing that somebody had called it in |
| Pat: | OK now he was at . . . Easley Baptist . . . Friday and Saturday. They transferred him to Greenville . . . . Sunday . . . he [went] to Memorial Hospital. Now I know Memorial called this in. Greenville Memorial called this in this morning. But I was just making sure, cause I had called Sunday and did get a recording and had left some information on Sunday. That could be it. But <u>I just wanted to make sure this was covered</u>. |
| BCBS: | Yep, its both of them are in here |
| Pat: | OK, that's all I need to know then |

(Doc. No. 17-7 at 8: BCBS 550) (emphasis added). Plaintiff states that he relied on this confirmation when he decided to get knee and shoulder surgery and related physical therapy in 2006 and 2007. (Doc. No. 21 at 3). Defendant argues that "Plaintiff's declaration conflicts with

the telephone call transcripts." (Doc. No. 25 at 5). The Court agrees that Plaintiff's declaration is not entirely consistent with the January 9 transcript. See (Doc. No. 20-2 at ¶ 7) ("In January 2006, I needed medical treatment and surgery for my knee, and later for my shoulder. . . . Before receiving this treatment, my wife called BCBS to confirm that indeed I did have coverage. BCBS confirmed the availability of coverage."). Defendant could be liable for a breach of fiduciary duty if Plaintiff can "show that Defendant knew or should have known that Plaintiff labored 'under a material misunderstanding that [would] inure to his detriment . . . -especially when that misunderstanding was fostered by the fiduciary's own material representations or omissions.'" Brown v. Am. Bankers Life Assur. Co. of Fla., 366 F. Supp. 2d 410, 415 (W.D. Va. 2005) (quoting Griggs, 237 F.3d at 381). It is a question for the finder of fact whether Plaintiff reasonably relied on BCBS's oral representation in January 2006 in believing that he would be covered by the Plan for his knee and shoulder surgeries.

2. BCBS's Alleged Misleading Pattern of Behavior

Plaintiff received costly medical treatment in 2006 and 2007, primarily for knee and shoulder surgery and related physical therapy. During this time, BCBS paid the numerous medical claims it received from various medical service providers. BCBS alleges that it discovered in or around February 2007 that Plaintiff was eligible for, but had not elected, Medicare Part B coverage. Consequently, BCBS recovered approximately $82,407 from medical service providers that it had paid "in error." The medical service providers subsequently billed Plaintiff for their services. See (Doc. No. 17-1: AR 34-92) (bills received by Plaintiff for surgeries and related treatment during 2006 and 2007). Plaintiff states that "this action has destroyed his credit and subjected him to medical claims collection activity by the providers whose bills remain unpaid." (Doc. No. 21 at 7).

16

Plaintiff points to BCBS's pattern of behavior as evidence that he reasonably relied on BCBS's alleged representations that it was his primary insurer. Plaintiff argues that, while he needed the knee and shoulder surgery, it was not performed on an emergency basis and he could have obtained Medicare Part B coverage before the surgeries if he had not been led to believe he did not need it. The undisputed evidence shows that between 2005 and 2007, BCBS processed and paid Plaintiff's medical claims as the primary payor. (Doc. Nos. 21 at 4; 7: Def. Answer at ¶13). Between January 2006 and February 2007, BCBS records show approximately twenty-three (23) calls from medical providers who were calling to confirm coverage. (Doc. Nos. 17-7 at 4-60: BCBS 546-602; 17-8 at 1-57: BCBS 603-659; 20-5: Summary of calls to BCBS by Medical Providers). They were consistently told that BCBS was the primary Plan. (Id.). From October 9, 2006 through March 21, 2007, BCBS repeatedly denied Plaintiff's claims on the mistaken belief that treatment was for a work-related injury, despite numerous assurances from Plaintiff and his wife that this was not true. (Doc. No. 21 at 4). It took sixteen (16) calls and a letter to BCBS to clear this up. (Doc. Nos. 17-1 at 5-8: AR 005-08; 20-4 at 2-11: Summary of Calls). BCBS made no mention of Medicare Part B coverage during these calls. (Doc. No. 21 at 4). There is a genuine issue of material fact regarding whether BCBS's payment of these claims in error affected the reasonableness of Plaintiff's reliance on BCBS's previous representations.

## IV. CONCLUSION

In sum, there are genuine issues of material fact regarding whether Plaintiff made the 2005 telephone call and the contents of that call, Plaintiff's reasonable reliance on the statements made by a BCBS representative in that call and the 2006 call, and the extent to which Defendant's erroneous payments affected the reasonableness of Plaintiff's reliance on BCBS's

17

earlier representations. In light of these issues, Plaintiff's Motion for Summary Judgment, (Doc. No. 21), is **DENIED**.

Finally, the Court notes that Defendant has yet to provide Plaintiff a copy of the actual plan documents, thus precluding Plaintiff from determining whether the SPDs are consistent with the plan documents. See (Doc. No. 24 at 2 n.1) ("Although Plaintiff's counsel had requested copies of plan documents as far back as August 17, 2007 (AR 0015-16), the full plan document never has been produced."). The Fourth Circuit explained in McCravy II that, "per Amara, 'summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan . . . .'" 2012 WL 2589226, at *5 n.5 (quoting Amara, 131 S. Ct. at 1878); see also Skinner v. Northrop Grumman Retirement Plan B, 673 F.3d 1162 (9th Cir. 2012). Thus, Defendant has "not provided evidence suggesting that the actual terms of the plan were ever communicated to [Plaintiff], beyond the SPD." Israel, 2012 WL 3116544, at *6 n.11; see also McCravy, 2012 WL 2589226, at *5 n.5. Defendant is **ORDERED** to provide Plaintiff with a copy of the relevant plan documents within **thirty (30) days** of entry of this Order.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 19), is **DENIED**;

2. Plaintiff's Motion for Summary Judgment, (Doc. No. 21), is **DENIED**; and

3. Defendant is **ORDERED** to provide Plaintiff with a copy of the relevant plan documents within **thirty (30) days** of entry of this Order.

Signed: September 30, 2012

Robert J. Conrad, Jr.
Chief United States District Judge